**FILED**

FEB 2 0 2009

AT 8:30 ..... *4:36* ..... M
WILLIAM T. WALSH
CLERK

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

Chapter 11

|  |
|---|
| **In Re:** |
| **BURNS AND ROE ENTERPRISES, INC., et al.,** |
| **Debtors.** |

**District Court Case No. 08-4191 (GEB)**

Bankr. Case Nos. 00-41610 and
                  05-47946(RG)
(Jointly Administered)

**OPINION**

APPEARANCES:

Sills Cummis & Gross PC
BY:  Jack M. Zackin, Esq.
1 Riverfront Plaza
Newark, NJ 07102
Attorney(s) for the Debtor(s), Burns and Roe Enterprises Inc., et al.

K&L Gates LLP
BY:  Donald W. Kiel, Esq.
One Newark Center, 10th floor
Newark, NJ 07102
Special Counsel for the Debtor(s), Burns and Roe Enterprises Inc., et al.

Forman Holt Eliades & Ravin,LLC
BY:  Joseph M. Cerra, Esq.
80 Route 4 E, Suite 290
Paramus, NJ 07652
Attorney(s) for Anthony Calascibetta, Legal Representative of
    Future Asbestos Personal Injury Claims

RECEIVED-CLERK
U.S. DISTRICT COURT
2009 FEB 20  P 4:36

1

Pryor Cashman, LLP
BY:  Richard Levy, Jr., Esq.
Mark A. Tamoshunas, Esq.
410 Park Avenue
New York, NY 10022
Attorney(s) for Anthony Calascibetta, Legal Representative
    of Future Asbestos Personal Injury Claims

Lowenstein Sandler PC
BY:  Jeffrey A. Kramer, Esq.
65 Livingston Avenue
Roseland, NJ 07068
Attorney(s) for the Official Committee of
    Unsecured Creditors

Caplin & Drysdale
BY:  Peter Van N. Lockwood, Esq.
One Thomas Circle, N.W.
Suite 1100
Washington, C.C. 20005
Attorney(s) for the Official Committee of
    Unsecured Creditors

Gilbert Oshinsky, LLP
BY:  Jonathan M. Cohen, Esq.
1100 New York Avenue, NW
Suite 700
Washington, DC 20005
Special Counsel for the Official Committee of
    Unsecured Creditors

Seyfarth Shaw, LLP
BY:  David C. Christian, II, Esq.
131 S. Dearborn Street, Suite 2400
Chicago, IL 60603
Attorney(s) for Continental Casualty Co.,
    and American Casualty Co.

Stevens and Lee, P.C.
BY:  John C. Kilgannon, Esq.
        John D. Demmy, Esq.
1818 Market Street, 29th Floor
Philadelphia, PA 19103
Attorney(s) for Fireman's Fund Insurance Co.

2

Office of the United States Trustee
BY:  Mitchell B. Hausman, Esq.
One Newark Center, Suite 2100
Newark, NJ 07102

BROWN, Chief Judge

## Introduction

Before the Court is the Fourth Amended Plan of Reorganization of Burns and Roe

Enterprises, Inc. ("BREI") and Burns and Roe Construction Group, Inc., ("BRCGI" and

together with BREI, the "Debtors") under Chapter 11 of the United States Bankruptcy

Code ("the Plan") dated June 9, 2008 submitted by the Debtors.  The Official Committee

of Unsecured Creditors (the "ACC" or "Committee"), and Anthony R. Calscibetta, the

Legal Representative for Future Asbestos Claims (the "Legal Representative" or "FCR"),

collectively referred to as the "Plan Supporters," join the Debtors' request that the Plan be

confirmed.  Also before the Court is the Motion of Fireman's Fund Insurance Company

("FFIC") *In Limine* to Preclude Plan Proponents From Presenting Testimony, Evidence

and Argument on Matters Withheld in Discovery. Objections to the Plan have been filed

by FFIC, the United States Trustee (the "UST"), Centennial Insurance Company

("Centennial") and TIG Insurance Company ("TIG"). A confirmation hearing was held on

November 13, 2008 (the "Confirmation Hearing"), and provided for future party

submissions.[1]  The following constitutes this Court's findings of fact and conclusion of

law.  As a preliminary matter, this Court has jurisdiction over this matter pursuant to 28

U.S.C. §1334.  Each of the Debtors was and is qualified to be a debtor under Section 109

---

1 The Hon. Rosemary Gambardella, U.S.B.J. sat with this Court at the Confirmation Hearing.

of the Bankruptcy Code.  Venue of the Chapter 11 Cases in the United States District

Court and the  United States Bankruptcy Court for the District of New Jersey was proper

as of the petition date, pursuant to 28 U.S.C. §1408, and continues to be proper.  The

District Court has jurisdiction to enter a final order with respect to Confirmation of the

Plan.

Facts

On December 4, 2000 (the "Petition Date") BREI filed a voluntary petition for

relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

BRCGI filed a voluntary Chapter 11 petition on October 12, 2005.  The cases were

administratively consolidated by Order of the United States Bankruptcy Court for the

District of New Jersey (the "Bankruptcy Court") dated November 7, 2005.  Since their

respective bankruptcy filings, BREI and BRCGI have continued to operate their

businesses and manage their assets as debtors- in-possession pursuant to § 1107(a) and

§ 1108 of the Bankruptcy Code.

BREI's Second Amended Disclosure Statement dated December 5, 2005

describes the Debtors and their operations as follows:

> BREI is a New Jersey corporation engaged in engineering and
> construction activities.  BRCGI is a Delaware corporation that serves
> as a vehicle for BREI's union construction work.

> Since its inception, BREI has focused its operations on engineering,
> construction and related activities for the power generation industry,
> both governmental and commercial.

> Minimizing safety risks to plant operators from high temperature
> liquids and vapors used to produce electrical power is a significant
> issue for power generating facilities.  Historically, those risks were
> addressed through the use of asbestos and asbestos-containing

4

materials. For decades, asbestos was the state-of-the-art material of choice because of its unique fire and heat resistant properties and its light weight. As s result, through at least the early 1980's, customers of BREI (both governmental and commercial) typically specified asbestos or asbestos containing materials to be installed in power generating facilities. BREI never mined, milled, or manufactured any asbestos or asbestos-containing materials.

In 1984, BREI was named in its first asbestos bodily injury lawsuit. Over the next six years, some 150 asbestos lawsuits were filed against it. By the early 1990's, the volume of asbestos lawsuits filed by one New Jersey law firm increased significantly. In late 1999 to early 2000, the volume of asbestos claims filed against BREI increased dramatically, as did plaintiffs' settlement demands.

BRCGI is a vehicle for union construction work. BRCGI is essentially operated on a break-even basis with all profits and losses passed through to BREI. As of the date of [the Bankruptcy] Court's order of May 21, 2001 enjoining the commencement of asbestos-related lawsuits against affiliates of BREI, BRCGI had been named as a defendant in various asbestos-related personal injury actions. Several additional asbestos-related lawsuits were filed against BRCGI in the months following the entry of the injunction. BRCGI believes that but for the entry of this injunction, it is likely that BRCGI would have been named as a defendant in additional personal injury actions involving exposure to asbestos and/or asbestos containing products.

*Second Amended Disclosure Statement of BREI Dated December 5, 2005 at p. 7.*

Prior to the bankruptcy filings, there were more than 12,000 asbestos-related personal injury actions filed against Debtors. On the Petition Date, BREI filed an Adversary Proceeding in its Chapter 11 case against its primary, umbrella and excess insurance carriers, as well as carriers that had issued certain wrap-up policies. The Adversary Proceeding, *Burns & Roe Enterprises, Inc. v. Continental Casualty Co. et al*, 00-3755(RG) seeks a declaration of BREI's rights to insurance coverage for asbestos claims.

On December 20, 2000, the Office of the United States Trustee appointed the

5

Committee which is comprised of Asbestos Personal Injury Claimants pursuant to 11 U.S.C. § 1102(a)(1). On March 19, 2002, the Bankruptcy Court entered an Order appointing Anthony R. Calascibetta as the Legal Representative of Future Asbestos Claimants in the BREI Chapter 11 case. On November 7, 2005, the Bankruptcy Court entered an Order appointing Mr. Calascibetta as the Legal Representative in the BRCGI case.

The Third Amended Plan of Reorganization

On December 5, 2005, BREI filed a Third Amended Plan of Reorganization and BRCGI filed a Plan of Reorganization which adopted BREI's Third Amended Plan. Debtors also filed a Disclosure Statement along with the Third Amended Plan. BREI's Third Amended Plan set forth a separate class for Asbestos Personal Injury Claimants and Indirect Asbestos Personal Injury Claimants referred to as Class 5 Claimants. Many of the Class 5 claims are contingent and unliquidated. The Debtor's Third Amended Plan of Reorganization called for establishing an Asbestos Personal Injury Trust, which upon the Third Amended Plan's Effective Date, would receive an assignment of all the Debtor's rights under insurance policies and assume all liability to Trust Claimants, and also called for the issuance of a Channeling Injunction to prohibit the assertion of future asbestos personal injury claims against the Debtors and other Protected Parties, specifically identified under the plan.

The Disclosure Statement

By Order dated January 19, 2006, the Bankruptcy Court approved the Debtors' Disclosure Statement as containing adequate information pursuant to 11 U.S.C. § 1125.

On the same date, the Bankruptcy Court entered an Order Amending Solicitation and Voting Procedures and Fixing Time for Filing Acceptances or Rejections of Plan and for Filing Objections to Confirmation ("the Voting Procedures Order"). On or about February 17, 2006, the Debtors transmitted the Plan and Disclosure Statement to the Class 5 Claimants, at a cost of $359,000.

Pursuant to the Voting Procedures Order, the Bankruptcy Court approved the form of a Class 5 Special Ballot to be transmitted to holder of Class 5 Asbestos Personal Injury Claims and Indirect Asbestos Personal Injury Claims, the only class of Claims impaired by the Third Amended Plan and therefore allowed to vote to accept or reject the Plan pursuant to 11 U.S.C. § 1126. In light of the unliquidated nature of the Class 5 Claims, the Voting Procedures Order valued each Class 5 Claim at $1.00 for voting purposes. The Voting Procedures Order also established the procedures pursuant to which the Disclosure Statement, the Third Amended Plan and the Class 5 Special Ballot were to be transmitted to the holders of Class 5 Claims by the Altman Group, the Debtors' balloting agent, and approved the form of a notice to be published in *USA Today* advising of the entry of the Voting Procedures Order and the March 31, 2006 deadline for the filing of written acceptances or rejections of the Third Amended Plan. As reflected in the Affidavit of Service of Kenneth Altman and Affidavit of Publication of Kenneth Altman, the Debtor complied with the notice and service requirements of the Voting Procedures Order.

On June 6, 2006, the Debtors filed the Affidavit of Kenneth Altman, Principal and President of the Altman Group, Inc., the voting agent approved by

the Bankruptcy Court to assist with the tabulation of votes submitted to accept or reject the BREI Third Amended Chapter 11 Plan and the BRCG Plan (the "Balloting Affidavit"). Mr. Altman's affidavit set forth that "the Altman Group tabulated the Class 5 BREI Ballots and BRCGI Ballots in accordance with the procedures set forth in the Voting Procedures Order" and certified that 13,183 Class 5 Claimants of BREI cast ballots accepting the Third Amended Plan while 112 Class 5 Claimants cast ballots rejecting BREI's Third Amended Plan, and that only one holder of a Class 5 claim against BRCGI cast a ballot, voting to accept the Plan. *See Aff. of Kenneth Altman* at ¶ 5.

During the pendency of these Chapter 11 Cases, the Bankruptcy Court approved settlements entered into between the Debtors and certain of their Affiliates and several of the Debtors' major insurance carriers, including Hartford Accident Indemnity Company and certain related companies, Certain AIG Member Companies, the Century Parties, and the Travelers Parties. In most of theses settlements, which were negotiated by the Debtors, the Committee and the Legal Representative, the Debtors' insurance carriers paid, or agreed to pay, a specified settlement amount to, or for the benefit of, the Asbestos Personal Injury Trust to be established pursuant to the Plan. In exchange, these insurance carriers received certain releases from the Debtors, and have been designated as "Settling Insurance Entities," thereby benefiting from all injunctions and other protects afforded to the "Settling Insurance Entities" under the Plan. These monetary settlements, which were approved by the Bankruptcy Court, will fund the Trust

8

with more than $162.75 million.

The Debtors also entered into non-monetary settlements with certain of their insurance carriers including CNA,[2] Centennial and TIG. CNA was among the insurer defendants in the adversary proceeding as a result of certain insurance policies CNA had issued in favor of the Debtors. CNA and the Debtors were in disagreement as to whether and to what extent CNA's policies covered the Debtors for asbestos claims. CNA had also raised preliminary objections to the Debtors' Third Amended Plan of Reorganization. The Debtors, the Committee, the Legal Representative and CNA settled the Adversary Proceeding as to CNA by entering into an Agreement and Addendum to the Plan of Reorganization of Burns and Roe Enterprises, Inc., and Burns and Roe Construction Group, Inc. (the "Addendum"), which provided a mechanism through which potential 'CNA Trust Claims' could be handled. The CNA settlement does not provide for releases of CNA's coverage obligations. As stated more fully in the Addendum, the Trust may authorize individual claimants, whose claims are potentially covered by policies issued by CNA, to commence litigation in the tort system. In the event that CNA is required to pay amounts pursuant to the terms of the Addendum as a result of this litigation, these amounts will be paid to the Trust for administration and distribution to asbestos claimants.

The CNA settlement required that certain modifications be made to the Third Amended Plan, mainly definitional changes, to make the Third Amended

---

[2]Continental Casualty Company, American Casualty Company of Reading, Pa and Commercial

9

Plan and the Addendum consistent. In a May 7, 2008 bench opinion, the Bankruptcy Court approved the Debtors' settlement with CNA, and specified in its decision that "the approval of the claims handling procedures for asbestos claims implicating CNA insurance Policies established by the Addendum is to be decided at confirmation."

Debtors filed the Plan on June 9, 2008. The Addendum has been appended as an additional Plan document. In a July 10, 2008 bench opinion, the Bankruptcy Court granted the Debtors' Motion to Proceed to Confirmation Without Further Disclosure or Acceptances With Respect to the Fourth Amended Plan of Reorganization, reasoning that "the Addendum and the modifications to the Plan embodied in the Fourth Amended Plan have not materially and adversely affected the treatment of claimants who voted on the Third Amended Plan and Disclosure Statement."

Subsequent to filing the Plan, the Debtors filed an Amended Asbestos Personal Injury Settlement Agreement (Plan Exhibit "C"), and Second Amended Trust Distribution Procedures (Plan Exhibit "H").

Objections to Confirmation

By Order dated July 25, 2008, the Bankruptcy Court established September 30, 2008 as the deadline for filing objections to the Plan. Preliminary objections to the Plan were filed by Centennial and FFIC on August 6, 2008. Objections to the Plan were filed by FFIC and the UST. In addition, TIG filed a joinder to FFIC's

---

Insurance Company of Newark, N.J. are referred to collectively as "CNA."

objection. The Debtors and the ACC and the FCR filed responses to the objections on October 14, 2008. FFIC filed a reply on the issue of standing on November 11, 2008.

The Debtors, the Committee and the Legal Representative negotiated settlements with Centennial and TIG resolving those objections to confirmation prior to the Confirmation Hearing. TIG and Centennial each issued a single "wrap-up" policy covering Burns and Roe work sites identified in their respective insurance policies. Pursuant to these settlements, approved by the Bankruptcy Court on October 7, 2008, and October 31, 2008, respectively, the parties have resolved the effect that confirmation will have under the TIG and Centennial Policies.

The UST's objections to confirmation of the Plan have been resolved, in part, through the Debtors' agreement, consented to by the Committee and the Legal Representative, to modify the definition of "Protected Parties" contained in Section 1.1(56) of the Plan, the definition of "Exculpated Party" contained in Section 1.1(37) of the Plan, and the provision dealing with "Exculpation" contained in Section 11.2 of the Plan.

At the Confirmation Hearing, Mitchell Hausman from the Office of the United States Trustee, appeared on behalf of the United States Trustee, and stated that the United States Trustee is withdrawing its arguments that the Debtors' contribution to the Trust is contrary to the provisions of the Bankruptcy Code.

Withdrawal of the Reference

By Order dated September 15, 2008, on motion of the Debtors, with the

11

support of the Committee and the Legal Representative, this Court withdrew the reference in these cases with respect to the Confirmation Hearing.[3]

FFIC's Objections to Confirmation

FFIC argues that the Plan fails to satisfy the good faith requirement of Section 1129(a)(3) of the Bankruptcy Code. *See Memorandum of Law of Fireman's Fund Insurance Company in Support of Objection to the Fourth Amended Plan of Burns and Roe Enterprises, Inc. and Burns and Roe Construction Group, Inc. (the "FFIC Mem.")* at 2.

FFIC argues that the Plan and related trust documents were developed by the Committee and Legal Representative for the benefit of their constituencies, and are therefore rife with inherent conflicts of interest. *Id.* at 21. Further, FFIC asserts that the Trust will be controlled by representatives of the asbestos claimants. *Id.* at 4. FFIC argues that the Debtors' proposed contribution of a $9,250,000 promissory note payable over ten (10) years to the Trust is nominal, and that the Debtors have failed to increase the amount of their financial contribution to the Trust despite improved financial performance since the amount of that contribution was negotiated back in 2003. *Id.* at ¶¶ 3, 4. FFIC contends that the Debtors are forcing their insurers to face the entire burden of their alleged asbestos liabilities. *Id.* at 21. Further, FFIC contends that the Debtors have not updated financial statements filed with the Bankruptcy Court in December 2005 in connection with the Disclosure Statement. *Id.* at 24. FFIC argues that the

---

3 That Order provided "that the Court will withdraw the reference in part, pursuant to 11 U.S.C. §157(d), namely in respect to the confirmation hearing…and it will also call on the assigned

"failure…to revisit the issue of the Debtors' financial contribution in light of these developments is indisputable evidence that the Plan is not being proposed in good faith." *Id.* at 24 (*citing In re Walker*, 165 B.R. 994, 1001 (Bankr. E.D.Va. 1994); *In re Kemp*, 134 B.R. 413, 416-417 (Bankr. E.D.Cal. 1991)). FFIC cites *In re Combustion Eng'g*, 391 F.3d 190, 234 (3d Cir. 2005) for the proposition that "the provisions of section 524(g)(2)(B)(i) are designed to cause the reorganizing debtor…to act as an evergreen source of funding to pay asbestos claims into the future." *Id.* at 23-24.

FFIC further argues that the Plan is not proposed in good faith as it violates FFIC's contractual rights, and relieves Debtors of their corresponding contractual obligations to cooperate in the investigation and defense of any asbestos-related claims, under the FFIC Policies.[4] *Id.* at 5. FFIC asserts that the Debtors have an affirmative, continuing duty to cooperate with FFIC in the defense and investigation of any and all claims that may be entitled to coverage under the FFIC Policies, and the that Plan relieves the Debtors of this obligation. *Id.* at 28. FFIC argues that the Plan violates § 502(a) of the Bankruptcy Code by divesting FFIC of its statutory right to object to claims, and violates § 502(b) by granting the Trust the exclusive right to allow claims without providing the Court with any role in the claims resolution process. *Id.* at 29.

FFIC contends that it "also may be a party to certain other agreements

Bankruptcy Judge to sit with the Court at the confirmation hearing."
4 FFIC Policies refer three excess, wrap-up insurance policies, policy numbers, XEX 1305833, XEX1345225, and XEX1345242 issued by FFIC in connection with an electric generating plant know as the Cross Generating Power Station located in South Carolina.

13

relating to the FFIC Policies, which it collectively refers to as the "FFIC Agreements." *Id.* at 6. In FFIC's opinion, the FFIC Agreements are executory contracts as defined in § 365 of the Bankruptcy Code. FFIC argues that it presently holds unliquidated claims arising from Debtor's continuing contractual obligations, and based upon its rights to receive performance of any and all of Debtors' duties and obligations under the FFIC Policies. *Id.* at 6. FFIC argues that the Plan materially and adversely affects the ability of FFIC to enforce its contractual rights, and relieves Debtors of reciprocal contractual obligations, and that under the Plan and the TDP, neither the Reorganized Debtors, the Trust nor anyone else has any duty to cooperate with FFIC.

FFIC argues that if the Plan is confirmed, the asbestos claimants and their lawyers will effectively control the processing and payment of their own asbestos-related claims, as the Trust will have authority over any settlement of coverage issues with insurers *Id.* at 10. FFIC contends that the asbestos claimants were afforded the opportunity to develop and draft the Trust Agreement and TDP, and had significant input into the development of the Plan, making the plan not proposed in good faith and subject to impermissible conflicts of interest. *Id.* at 26. FFIC cites *In re ACandS, Inc.*, 311 B.R. 36 (Bankr. D. Del. 2004) for the proposition that "[c]ourts have refused to confirm a plan, on the basis of lack of good faith under § 1129(a)(3) where Chapter 11 debtors are either controlled by, or colluded with, asbestos claimants in the formation of the plan." *Id.* at 27. FFIC contends that the Plan fails to disclose the identity of the initial Trustees of

14

the Trust as required by § 1129(a)(5) of the Bankruptcy Code. *Id.* at 11, n. 12. It should be noted that Section 7.5 of the Plan provides for the selection of Trustees by the Committee and the Legal Representative to be disclosed to the Bankruptcy Court prior to the conclusion of the confirmation hearing. As an example of the influence of asbestos claimants, FFIC argues that the appointment of any successor Trustee must be made in consultation with holders of Asbestos Personal Injury Claims and the Legal Representative, as members of the TAC. *Id.* at 11. FFIC emphasizes that pursuant to Section 2.2(e) of the Asbestos Personal Injury Trust Agreement (the "Trust Agreement"), the Trustees are required to consult with the TAC and the Legal Representative on the general implementation and administration of TDP and the Trust. *Id.* at 11. FFIC notes that pursuant to Section 2.2(f) of the Trust Agreement, the Trustees must obtain the express consent of the TAC and the Legal Representative on significant Trust matters. *Id.* at 11.

FFIC contends that the current Trust Distribution Procedures (the "TDP") give asbestos claimants significant influence over the processing and payment of asbestos-related claims. FFIC objects to the guidelines set forth in the TDP for processing claims as being "unreasonably lax" and the fact that Section 2.2 of the TDP, allows for the utilization of an Individual Review Process, which may in certain circumstances authorize the Trust to pay claims that do not meet the presumptive 'Medical/Exposure Criteria' for the relevant 'Disease level,' an amount up to the 'Scheduled Value' of the 'Disease Level' if the Trust is satisfied

15

that the claimants has presented a claim that would be cognizable and valid in the tort system. *Id.* at 12. FFIC argues that the representatives of asbestos claimants are interested in maximizing their own clients' recoveries.

FFIC argues that the current terms of the TDP, as proposed will result in harm to insurers, and that the TAC has extremely broad and unfettered discretion to change anything about the Trust or TDP they wish. *Id.* at 13. FFIC argues that the current medical and exposure standards will result in the compensation of meritless claims, as the Section 5.7(a)(2) of the TDP "would simply require claimants to submit a claim form providing generic information regarding the nature of the alleged claim," and allows a claimant to recover even if he received and adverse result in the tort system in asbestos-related litigation against any other defendant. *Id.* at 13.

FFIC argues that the TDP creates significant risk for, and harm to FFIC as it will encourage claims to be filed relating to the Cross Generating Power Station located in South Carolina, for which the Trust will demand payment from FFIC. *Id.* at 9. According to FFIC, "the Trust will seek coverage from FFIC without FFIC's corresponding ability to participate in the defense of, or in the processing and payment of the claims as contemplated by the TDP's." *Id.* at 9. FFIC posits that it will not be made aware of the basis on which the claim was asserted against the Trust as Section 6.5 of the TDP makes all information submitted by a claimant in support of the claim "privileged" and "confidential," causing asbestos-related claims that otherwise not receive compensation in the tort system to be paid at the

16

values mandated by the TDP. *Id.* at 9.

Citing *In re Silica Prods. Liab. Litig.,* 398 F.Supp. 2d 563 (S.D. Tex. 2005), FFIC argues that although the TDP requires claimants to submit a statement from a physician, there are no safeguards to ensure those statements are credible. *Id.* at 14. Further, FFIC argues that Section 5.7(b)(3) of the TDP reduces the asbestos claimants' obligation to identify a connection to one or more of the Debtors' construction projects, by merely requiring a claimant to demonstrate "meaningful and credible exposure" to asbestos-containing products, for which the Debtors or others are liable, without ensuring the Debtors liability for any such exposure, and without considering the claimants actions. *Id.* at 15.

FFIC argues that the TDP eliminates many meritorious defenses, which would reduce the total number of claims against the Trust. Specifically, FFIC notes that Section 5.1(a)(2) of the TDP eliminates all applicable statute of limitation defenses by providing for exceptions not available in the tort system, such as the statute of limitations being tolled if the claimant filed a claim against another defendant in the tort system. *Id.* at 16.

FFIC argues that Section 6.5 of the TDP impairs its state law rights by protecting information provided by asbestos claimants in support of their claims, and keeping such information confidential, absent FFIC obtaining a subpoena, thus preventing FFIC from discerning whether such claims are covered under the FFIC policies, and discovering the basis on which such claims are allowed and paid. *Id.* at 16. FFIC contends that section 6.5 of the TDP was not proposed in

17

good faith, and violates FFIC's contractual rights under the FFIC Policies. *Id.* at 17.

FFIC argues that the TDP will deprive insurers of their contractual rights to participate in, or control, the defense and settlement of claims. *Id.* at 17. FFIC notes that under Section 2.2 of the TDP, the Trust has exclusive authority to resolve 'Asbestos Personal Injury Claims,' without participation by any insurers. *Id.* at 17. Further, FFIC does not have the right to participate in any arbitration to resolve disputes over a claimant's medical condition, exposure history, or the liquidated values. *Id.* at 17.

FFIC argues that the TDP does not require that an asbestos related claim be offset or reduced due to a claimant having previously recovered for the same asbestos exposure from other defendants. *Id.* at 18. FFIC contends that a claimant may delay filing claims against the Trust until after having obtained a recovery in the tort system from non-debtor defendants. *Id.* at 18.

FFIC argues that the Plan is not "insurance neutral," and does not contain neutrality provisions similar those found in other recent asbestos-related plans, including *In re Fed. Mogul Global, Inc.*, Case No. 01-10578 (Bankr. D. Del.) and *Combustion Eng'g*, 391 F.3d 130 (3d Cir. 2005). *Id.* at 22. FFIC posits that the Plan could be rewritten to allow the FFIC Policies to "pass through" the bankruptcy unaffected by confirmation of the Plan...with Debtors and FFIC's rights and obligations thereunder remaining entirely unaffected. *Id.* at 22.

FFIC argues that the Plan fails to comply with § 524(g)(2)(B)(i)(II) of the

18

Bankruptcy Code which requires an asbestos personal injury trust "to be funded in whole or in part by the securities of 1 or more of the debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends." *Id.* at 36. FFIC argues that the Debtor's obligation to contribute a promissory note to the Trust "does not constitute a 'security' because it would not be held or traded for investment." *Id.* at 36. Acknowledging that this promissory note is secured by a pledge of 51% of the voting shares of Burns and Roe Group, Inc. (BRG), the Debtors' parent, FFIC argues that the ownership rights represented by the stock pledge would be valueless once the Debtors have defaulted on the promissory note. *Id.* at 36.

FFIC argues that the Plan discriminates against FFIC, and treats FFIC's claims in a manner that is not fair and equitable as the "release, injunctions and purported "free and clear" transfer of the FFIC Policies to the Trust impermissibly abrogates any set-off, subrogation, contribution and/or recoupment rights; rights to require the insured to pay any retrospective premiums, deductibles, self insured retentions and/or satisfy any other monetary obligations under the FFIC Policies. *Id.* at 36-37.

FFIC argues that the Plan does not satisfy the requirements of § 1129(a) of the Bankruptcy Code on the grounds that:

> (i) there is no legal or equitable basis for the issuance of the Asbestos Permanent Channeling Injunction with respect to certain of the Protected Parties;

19

(ii)    it improperly provides for third-party releases in violation of section 524(e) of the Bankruptcy Code,

(iii)    it improperly requires this Court to make certain finding of fact and conclusions of law as conditions precedent to confirmation;

(iv)    it improperly attempts to confer broad jurisdiction on the Bankruptcy Court;

(v)    it is not proposed in good faith and relies on means forbidden by law;

(vi)    the compensation provided in connection with the Trust has not been approved by, or is not subject to approval by, this Court as being reasonable, as required by section 1129(a)(4) of the Bankruptcy Code, and

(vii)    the proposed appointment of members of the TAC is contrary to public policy and violates section 1129(a)(5)(A)(ii) of the Bankruptcy Code.

*Id.* at 38.

Joint Brief in Support of Confirmation of the Debtors' Plan and In Opposition to Objections Filed by FFIC

The Plan Supporters endorse Debtor's Fourth Amended Plan for confirmation. The Plan Supporters contend that the Plan provides for proper treatment and disposition of current and future asbestos related claims against Debtors in accordance with Section 524(g), and also complies with fundamental principles of bankruptcy and insurance law when it proposes for a transfer of insurance proceeds to a Trust.

The Plan Supporters contend that the Trust is to administer and compensate valid asbestos claims for which the Debtors would have had legal liability, for a period of approximately 40 years from the Trust's inception. *Joint Memorandum of*

20

*Law of the Official Committee of Unsecured Creditors and the Legal Representative for Future Asbestos Claimants in Support of Confirmation of the Debtors' Fourth Amended Plan of Reorganization and in Opposition to Objections Filed by Fireman's Fund Insurance Company (the "Joint Mem.")* at 5.

The Plan Supporters note that the "the Trust will be administered by a single Trustee, with the advice and oversight of a Trust Advisory Committee ("TAC") and a post consummation FCR." *Id.* at 6. Alfred M. Wolin, a retired Judge of the United States District Court for the District of New Jersey is the proposed Trustee. *Id.* "The TAC for the Trust will consist of Lisa Nathanson Busch and Deirdre Woulfe Pacheco," attorneys who represent asbestos claimants. *Id.* Anthony R. Calascibetta will continue as the Legal Representative. *Id.*

Claims will be handled and paid by the Trust as provided in the TDP. *Id.* at 8.

In response to FFIC's contradictions that the Trust Agreement and Trust Distribution Procedures are the products of collusive negotiations between ACC and FCR, resulting from those parties' alleged domination and control of the bankruptcy case, and that the Trust's handling and payment of claims as guided by lax standards will come entirely at the expense of FFIC, the Plan Supporters argue that neither of these objections are sufficient to deny confirmation. Apart from disagreeing with FFIC's assertion the negotiations between the Plan Supporters and the Debtors resulted in a tainted product prejudicing FFIC with regard to the processing of claims for benefits, the Plan Supporters also take issue with FFIC's contention that the assignment of insurance policies violate the anti-assignment clauses in its insurance

contracts with Debtors and foreclose the Plan's transfer of insurance proceeds to the Trust.

In response to FFIC's contention that the insurance policies qualify as executory contracts and can be rejected pursuant to § 365 of the Bankruptcy Code, the Plan Supporters contend that all the premiums have been paid, and only ministerial duties remain. As a result, even if § 365 applies, the Plan Supporters contend that the Debtors could cure a default. Further, the Plan Supporters argue that § 524 (g) impliedly preempts any anti-assignment clause that otherwise would foreclose the transfer of the estate's assets to the trust.

Debtors' Brief in Response to Objections to Confirmation

Debtors filed a Brief in Response to Objection to Confirmation in which Debtors argue that FFIC's confirmation objections concern "creditor issues" that may be raised only by the affected creditors, and that FFIC lacks standing to object to any Plan provisions that do not directly affect its own contractual interests, as FFIC is not a creditor of the Debtors' estates. *Debtors Brief in Response to Objections to Confirmation* at 8. Further, Debtors contend that FFIC's interests are directly adverse to the interests of the asbestos claimants. *Id.*

Debtors assert that "[t]he only objections that relate in any way to FFIC's rights are its contentions that the TDP violates the Debtors' contractual duty to cooperate and that the assignment of the Debtors' insurance rights to the Trust violates the anti-assignment provisions of its insurance policies." *Id.* at 9. Debtors respond to FFIC's contention that the TDP violates the duty to cooperate and other

22

contractual provisions by arguing that the "Plan's Insurance Neutrality Provision [Section 11.4] expressly preserves all of FFIC's defenses to coverage," stripping FFIC of standing to raise this objection. *Id.*

Debtors explain that "[t]o the extent that FFIC's objections do relate to purported violations of its policy rights, these objections have no merit because nothing in the Plan purports to divest FFIC of any of its contractual rights, with the exception of the Plan provision for the assignment of the Policy Interests." *Id.* at 17. Debtors argue that aside from the whether the Debtors may assign their policy rights to the Trust, "FFIC's objections with respect to the violation of its policy rights are insurance coverage issues," which should not be raised as part of the confirmation process, for if the Plan violates FFIC's contractual rights, FFIC may avail itself to remedies provided in the FFIC Policies and applicable non-bankruptcy law. *Id.* Debtors suggest that all such issues should be preserved for future litigation in this or another forum. *Id.* at 17 (*citing In re Fed. Mogul Global, Inc.*, No. 01-10578, 2007 WL 4180545, at *41,42 (Bankr. D. Del. Nov, 16 2007)).

Incorporating the arguments of the Committee and the Legal Representative in the Joint Memorandum of Law, Debtors argue that the assignment of policy rights as part of a Chapter 11 Plan is permissible as a matter of federal bankruptcy law notwithstanding any contractual language or state law to the contrary." *Id.* at 9.

Debtors argue that FFIC is subject to constitution and prudential standing requirements. *Id.* Debtors cite *Warth v. Seldin*, 422 U.S. 490, 498 (1975) for the proposition that "[t]he determination of whether a party has standing to appear

23

and be heard in a federal court requires a two-tiered inquiry involving both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise." *Id.* at 10.

Debtors argue that although the Third Circuit in *Combustion Eng'g*, 391 F.3d at 214 (3d Cir. 2004), held that 11 U.S.C. § 1109 confers a "broad right of participation in the early stages of a bankruptcy proceeding," it has also recognized that this right has limitations. *See Id.* at 9-10 (*citing In re Amatex Corp.*, 755 F.2d 1034, 1042-1043 (3d Cir. 1985). Debtors cite *In re Martin Paint Stores*, 199 B.R. 258, 263 (Bankr. S.D.N.Y. 1996), *aff'd.* 207 B.R. 57 (S.D.N.Y. 1977), in support of their contention that "it is beyond question that section 1109(b) cannot be construed in a manner that confers standing where the Constitution does not." *Id.* at 11.

Citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982), Debtors argue that FFIC lacks constitutional standing to object to confirmation and to conduct discovery on issues that do not affect their rights, as FFIC is not a creditor of the estate, and cannot demonstrate that they will personally suffer as a result of any plan provision that only affects the rights and treatment of the Debtors' asbestos creditors. *Id.* at 12.

Debtors further argue that prudential standing considerations prevent FFIC from objecting to plan provisions that do not affect their own interests, and that principles of prudential standing require that the bankruptcy court not allow an

24

estate's resources to be taxed by "peripheral parties" who seek to interject themselves into the case on every issue. *Id.* at 13 (*citing In re Refco, Inc.,* 505 F.3d 109,118 (2d. Cir. 2007)).

Debtors cite *In re Quigley Co.,* 391 B.R. 695 (Bankr. S.D.N.Y. 2008), where Chief Judge Bernstein, in addressing the debtor's insurance carriers discovery requests in connection with their objections to confirmation, concluded that the insurers' standing was limited to challenging the Plan provisions and raising the confirmation objections that directly affected their contractual rights." *Id.* Debtors argue that the Quigley Court did not entitle insurers who challenged the debtor's asbestos reorganization plan to raise objections that affected the rights of other parties, and urge this Court to rule accordingly. *Id.* at 13-15. Debtors also cite *Hartford Accident and Indem. Co. v. Global Indus. Tech., Inc.,* No. 07-1749 slip op. (W.D. Pa. July 25, 2008) for the proposition that a debtor's insurance carriers lack standing to object to confirmation. *Id.* at 15. Debtors argue that "FFIC did not file a proof of claim, either before or after the Bar Dates, and therefore is not entitled to treatment as a creditor." *Id.* at 19.

Debtors argue that "[t]he Plan, viewed in light of the totality of the circumstances, is a good faith effort to bring about the Debtors' reorganization in accordance with the objectives and purposes of the Bankruptcy Code and satisfies the requirements of section 1129(a)(3)." *Id.* at 22. Debtors contend that in formulating their Plan, the Debtors engaged in post-petition arms-length negotiations with the Committee and the Legal Representative while formulating the Plan, in

25

order to arrive at confirmable, consensual plan of reorganization. *Id.* at 21. Therefore, Debtors posit that the "[t]he collusion on the part of the prepetition asbestos plaintiffs committee in *ACandS* bears no resemblance to the facts of this case. *Id.*

Debtors argue that the "Plan satisfies the requirements of section 524(g)(2)(B)(i)" as the "statutory requirement that the Trust is to be funded by the securities of one or more of the debtors and by obligations of the debtors to make future payments to the Trust is satisfied by the Debtors obligation to make future payments to the Trust totaling $9.25 million (in addition to an initial payment of $250,000)....pursuant to Promissory Note," which according to the Debtors, constitutes a "Security" under 11 *U.S.C.* § 101(49). *Id.* at 23, 27.

Debtors assert that the requirement of § 524(g)(2)(B)(III)(bb) that the "Trust is to own or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of each debtor or the parent corporation of each such debtor" is satisfied as the Debtors' parent Company, Burns and Roe Group, Inc. ("BRG"), and BRG's parent, Winona Hudson Corporation ("WHC") will each execute a Settlement and Pledge Agreement, pursuant to which, WHC will pledge 51% of the common stock of BRG to the Trust as collateral to secure performance under the Promissory Note. *Id.* at 23-24.

Debtors argue the FFIC lacks standing to challenge the amount of the Promissory Note, alleging that FFIC "has no contractual or other legally cognizable interest in the amount that the Debtors are required to contribute to the Trust or the

26

terms of this contribution." *Id.* at 25. Debtors represent that their $9.5 million contribution was the result of arms length negotiations, and represent a significant portion of anticipated profits. *Id.* at 25-26.

Debtors contend that although "BRE[I] had historically high pre-tax profits in 2007 and projects historically high pre tax profits for 2008.....there is no assurance that the 2007 and 2008 results will be matched during the term of the Promissory Note." *Id.* at 26.

The Confirmation Hearing

At the start of the Confirmation Hearing, the Court reserved its decision on the issue of FFIC's standing. The Court did not rule on FFIC's motion in limine at the start of the Confirmation Hearing, electing to allow Mr. Calascibetta to testify, and render a decision if FFIC objected to specific portions of Mr. Calsacibetta's testimony. Since FFIC did not object to any portion of Mr. Calascibetta's testimony, FFIC's motion in limine is rendered moot.

At the confirmation hearing, the Debtors, the Plan Supporters and FFIC submitted a proposed stipulation of facts regarding the FFIC Policies (the "Stipulation"). In summary the Stipulation provides that in connection with the Cross Generating Power Station, FFIC issued three excess, wrap-up insurance policies, policy numbers, XEX 1305833, XEX1345225, and XEX1345242 for at least the policy periods from October 1, 1980 though October 1, 1983; "Burns & Roe," which is now known as BREI, one of the debtors, and "Burns and Roe, Inc." were identified as Named Insureds under the FFIC Policies; BRCG[I] was not named

27

as an additional insured under the FFIC Policies; since the FFIC Policies were issued, Burns and Roe Enterprises, Inc. has not tendered any asbestos-related claims to FFIC under the FFIC Policies; since the FFIC Policies were issued, BREI has not tendered claims of any kind to FFIC; FFIC did not consent to the proposed assignment of any Insurance Rights under the FFIC Policies to the Asbestos Trust pursuant to the Fourth Amended Plan; prior to the filing of the Preliminary Objections of Fireman's Fund Insurance Company to Confirmation of the Debtors' Fourth Amended Plan, neither the Debtors, the Committee, nor the Legal Representative requested FFIC's consent to the proposed assignment of any Insurance Rights under the FFIC Policies to the Asbestos Trust pursuant to the Fourth Amended Plan; FFIC did not consent to the terms of the Trust Distribution Procedures; and that prior to the filing of the Preliminary Objections of Fireman's Fund Insurance Company to the Debtor's Fourth Amended Plan, neither the Debtors, Committee nor the Legal Representative requested FFIC's consent to the Trust Distribution Procedures pursuant to the Fourth Amended Plan. *Stipulation of Facts Between Fireman's Fund Insurance Company, American Insurance Company, the Debtors, the Official Committee of Unsecured Creditors and the Legal Representative of Future Asbestos Personal Injury Claims (the "Cross Station Stip.") at ¶ 1-12.*

Testimony of Russell F. Smith, Jr.

At the confirmation hearing, Russell F. Smith, Jr., the Debtors' Chief Financial Officer, testified before this Court. Mr. Smith testified that he is "responsible for all of the financial affairs of the companies, including treasury,

28

accounting, tax, audit and insurance." (Nov. 13, 2008 Tr. at p. 22-24.)  Mr. Smith testified that the current business of BREI is "engineering, procurement and construction management services." (Nov. 13, 2008 Tr. at p. 9.) Mr. Smith testified that BRCGI "is not an operating entity, but rather a legal entity we use when we do union work as a subcontractor to Burns and Roe Enterprises." (Nov. 13, 2008 Tr. at p. 9.) Mr. Smith testified that prior to the Petition Date, there had been personal injury complaints filed against the BRE relating to asbestos claims, with the first complaint field in 1984. (Nov. 13, 2008 Tr. at p. 9.)  According to Mr. Smith, the number of asbestos claims against the Debtors were initially small, but started to grow in the early nineties, and in the late nineties increased significantly. (Nov. 13, 2008 Tr. at p. 10.)

Mr. Smith testified that certain of those asbestos claims were settled, with the decision to settle based on the recommendations of the debtors outside counsel and insurance carriers. (Nov. 13, 2008 Tr. at p. 10.) Mr. Smith testified that BREI had asbestos coverage for insurance claims, but the insurance coverage did not pay all of BREI's settlement and defense costs as some insurance carriers raised coverage issues, and there were periods of time where the Debtors had missing policies. (Nov. 13, 2008 Tr. at p. 10.) Mr. Smith testified that the total amount of settlement and defense costs with respect to asbestos claims filed against BREI was about $5,700,000, of which Burns and Roe paid about $2,100,000. (Nov. 13, 2008 Tr. at p. 11.) Mr. Smith also testified that the at the time of the Chapter 11 filing, settlements totaling $1,850,000 had been reached, but not yet paid out, and the Debtors would

29

have had to pay about $500,000 of those settlement amounts. (Nov. 13, 2008 Tr. at p. 11.) Mr. Smith testified that at that time, the Debtors "would have been able to pay those claims, but with the increasing nature of the number of claims and the settlement dollars, we didn't believe that we would be able to continue to pay future claims." (Nov. 13, 2008 Tr. at p. 12.) Further, Mr. Smith testified that he believed that the future of the company was at risk, and that there had been approximately 12,000 asbestos claims pending against BREI as of its Petition Date. (Nov. 13, 2008 Tr. at p. 12.) Mr. Smith testified that there had also been pre-petition asbestos claims field against BRCGI and additional claims were filed against BRCGI after BREI filed its Chapter 11 petition. (Nov. 13, 2008 Tr. at p. 12.)

Debtors' Contribution to the Trust

Concerning the Debtors' contribution to the Trust, Mr. Smith testified that the Debtors are contributing assets to the Trust, including insurance rights, and a cash contribution of $9,500,000 to be made payable over twelve years, in accordance with a "promissory note." (Nov. 13, 2008 Tr. at pp. 12-13.) Under that promissory note, the Debtors will make payment of $1,000,000 a year for the first two years, and $750,000 a year for the remaining ten years. (Nov. 13, 2008 Tr. at p. 13.) Mr. Smith testified that the obligors under the promissory note are the Debtors, BRG, Burns and Roe Services Corp. and Winona Hudson.  Mr. Smith testified that the Debtor's contribution to the Trust was determined based on the Debtor's historical financial performance, forecasted future profitability, and the volatility of the Debtor's recent earnings. (Nov. 13, 2008 Tr. at p. 14.)  Mr. Smith testified that he prepared a

30

schedule of the historical financial results of BREI from 1999 through the forecast for 2008 summary of BRE's profits, which was marked as Exhibit D-1. (Nov. 13, 2008 Tr. at pp. 14-15.) Mr. Smith testified that excluding reorganization costs and gains from asset sales, the average pre-tax profit for that ten year period was $739,000. (Nov. 13, 2008 Tr. at p. 16.) Mr. Smith also testified that he believed that the Debtors would be able to make the contributions under the note. (Nov. 13, 2008 Tr. at p. 17.)

Mr. Smith testified that the Debtors future payments under the promissory note are secured by a pledge of 51% of the stock of BRG. (Nov. 13, 2008 Tr. at p. 17.) Mr. Smith testified that BRG is the Debtors' parent corporation. (Nov. 13, 2008 Tr. at p. 13.) Mr. Smith testified that the Trust would be allowed to foreclose on the shares in the event of the payment default, and that a temporary cash shortfall would cause a default but note necessarily impact the profitability or the financial status of the company. (Nov. 13, 2008 Tr. at p. 18.)

Mr. Smith has testified that approximately $162 million was collected upon settlements with insurance carriers. (Nov. 13, 2008 Tr. at p. 18.)

Mr. Smith also testified that there is no way for the Debtors to determine the actual amounts or numbers and the timing or of any future claims that may be filed against the company due to the "rapidly increasing number of claims and claims demands and the latency of asbestos diseases." (Nov. 13, 2008 Tr. at p. 21.) Mr. Smith testified that he did not believe the Debtor would have had the ability to continue to pay asbestos claims as they were asserted absent the Chapter 11 Cases

31

"based on the levels of claims and the settlement, the size of the settlements in the latter years, and taking into consideration the large volume of claims we had at the time we filed." (Nov. 13, 2008 Tr. at p. 22.) Mr. Smith testified that he believed the Debtors "would have run out of money trying to settle all those claims." (Nov. 13, 2008 Tr. at p. 22.)

Mr. Smith testified that all payments which the Debtor has made to professionals have been approved by the Bankruptcy Court. (Nov. 13, 2008 Tr. at p. 23.) Mr. Smith testified that the current directors and officers of BREI have all been proposed to serve in the same capacity post confirmation, and that he did not know of any reason why the appointment or continuation of the individuals that are listed on Exhibits D-2 and D-3 would not be consistent with the interest of creditors and equity of interest holders. (Nov. 13, 2008 Tr. at p. 23.)

Mr. Smith prepared a schedule of the members of the Roe family that were currently employed by the Debtors and their current compensation, which was marked for identification as Exhibit D-4. (Nov. 13, 2008 Tr. at pp. 24-25.) Mr. Smith testified that there are no proposed changes to their compensation following confirmation of the plan. (Nov. 13, 2008 Tr. at p. 26.)

Mr. Smith testified that he prepared an updated liquidation analysis, which was marked for identification as Exhibit D-5. (Nov. 13, 2008 Tr. at p. 27.) In describing the methodology used to calculate this analysis, Mr. Smith testified that he calculated the company's assets as of the end of September 2008 and then calculated discounts to apply in order to recover those assets. (Nov. 13, 2008 Tr. at p. 27.) Mr

Smith testified he estimated the recoverable assets to be $9,576,000; estimated secured claims of $1,700,000; and estimated the costs of liquidation in terms of professional fees at $1,000,000; yielding a net available for administrative expense claims and unsecured claims of $6,860,000. (Nov. 13, 2008 Tr. at p. 26.) Mr. Smith testified that he believed there would be nothing available for general unsecured creditors of BREI in a Chapter 7 liquidation scenario. (Nov. 13, 2008 Tr. at p. 28.)

Mr. Smith testified that he prepared a similar analysis of what would be available for creditors in a hypothetical liquidation for BRCGI, employing the same methodology as the BRE liquidation analysis, which was marked for identification as Exhibit D-6. (Nov. 13, 2008 Tr. at p. 29.) Mr. Smith testified that the assets that are available to the creditors of BRCGI under the plan are greater than they would be in a hypothetical Chapter 7 liquidation. (Nov. 13, 2008 Tr. at p. 30.)

Further, Mr. Smith testified that the Debtors are current on their fees payable to the United States Trustee, and that the Plan provides for the payment of all of the United States Trustee's fees as of the Plan's 'Effective Date.' (Nov. 13, 2008 Tr. at p. 30.) Mr. Smith also testified that the Debtors currently have a health insurance program, and that the Plan provides for the continuation of all payments to retirees under that program after the effective date. (Nov. 13, 2008 Tr. at p. 30.)

Cross Examination of Russell F. Smith, Jr.

Under cross examination from FFIC's attorney, Mr. Demmy, Mr. Smith testified that discussions regarding the amount of the Debtor's contributions to the Trust between the Debtor, the Committee, and the Legal Representative occurred in

33

2002 and concluded sometime in the middle of 2003, and that since that time there had been no discussion about increasing or decreasing the Debtor's contribution. (Nov. 13, 2008 Tr. at p. 34.) Mr. Smith also testified that he lacked personal knowledge as to whether any claims were ever asserted on the Cross Generating Station Project. (Nov. 13, 2008 Tr. at p. 44.) Mr. Smith admitted that the shareholders' equity has improved at the current time from 2003 and 2004, and that generally speaking, the financial performance of the debtors for the years 2005, 2006 and 2007 has been substantially better than it as in 2002, 2003 and 2004. (Nov. 13, 2008 Tr. at p. 46.)

### Testimony of Anthony R. Calascibetta

The Court also heard testimony from Anthony R. Calascibetta. (Nov. 13, 2008 Tr. at p. 50.) Mr. Calascibetta testified that he was appointed as the "future claims representative" in March 2002 for the BREI and in November 2005 for BRCGI, and characterized his position as being the court-appointed representative of the interests and rights of demand holders against the debtors, and to represent those rights and interests in the bankruptcy proceeding. (Nov. 13, 2008 Tr. at pp. 50, 53.) Mr. Calascibetta testified that he has been involved in all aspects of the case since his appointment in 2002, including the development of the Plan. (Nov. 13, 2008 Tr. at p. 54.) Mr. Calascibetta testified that he supports the Plan, and that he believes the Plan and the Trust will treat the future asbestos claimants equitably and in a similar manner to the current asbestos claimants. (Nov. 13, 2008 Tr. at p. 55.) Mr.

34

Calscaibetta testified that he reached this conclusion after reviewing the claims that have been filed prior to the filing of the case, outstanding claims, open settlement, the company's estimate of potential liability contained in the NERA report, and taking into account the debtor's historical performance as well as other factors. (Nov. 13, 2008 Tr. at p. 55-56.)

Mr. Calascibetta testified that the TDP and the Trust Agreement contains procedures which outline the procedures for claims submission, claims resolution, and a matrix for the payment of claims. (Nov. 13, 2008 Tr. at p. 56.) Mr. Calascibetta also testified that there are certain limitations on the amount of funds that can be distributed in an individual year and also to the types of claimants, and that there is also an ability to re-evaluate the claims and the payout percentage after the first two years, as well as what he characterized as a "three-year look-back" afterwards. (Nov. 13, 2008 Tr. at p. 56.) Mr. Calascibetta testified that the Trust's payout percentage could also be reevaluated if there are any other substantial changes. (Nov. 13, 2008 Tr. at p. 56.) Mr. Calascibetta testified that there are medical and exposure criteria embodied in the Trust Documents, and that as the Legal Representative, he and the Trust Advisory Committee will provide oversight to the Trust. (Nov. 13, 2008 Tr. at p. 57.) Mr. Calascibetta also testified that there are limitations on the amendments to the Trust Agreement and the TDP, and that the Bankruptcy Court would retain jurisdiction over any disputes which may arise. (Nov. 13, 2008 Tr. at p. 57.) Mr. Calscibetta testified that the proposed Trustee is Alfred M. Wolin, and that the Trust Advisory Committee would include two

35

members, Deirdre Pacheco from Wilentz Goldman & Spitzer law firm, and Lisa Bush from Weitz & Luxemberg law firm. (Nov. 13, 2008 Tr. at pp. 57-58.)

Cross Examination of Anthony R. Calascibetta

Under cross examination from Mr. Demmy, Mr. Calascibetta stated that both Ms. Pacheco and Ms. Bush represent claimants against the Debtors. (Nov. 13, 2008 Tr. at p. 66.) Mr. Calascibetta also stated that the Trust would process the payment of claims, and that although there currently are no procedures for insurers to get involved, the trustee could make certain other decisions. (Nov. 13, 2008 Tr. at p. 67.)

Mr. Calascibetta testified that the scheduled values that appear in the TDP are based on other trusts and how claims are paid in other cases, and that there were seven or eight settlements prior the filing of the bankruptcy that are higher than the base matrix value, but less than the maximum value that could be paid by the Trust. (Nov. 13, 2008 Tr. at p. 69.)

Voting

At the Confirmation Hearing, Debtors' counsel, Mr. Zackin, also incorporated the Balloting Affidavit into the record. As represented to the Court by Mr. Zackin, subsequent to the filing of the Balloting Affidavit it was discovered that a total of 561 individuals had been mailed ballots despite the fact that they were not eligible to vote. (Nov. 13, 2008 Tr. at pp. 75-76). Debtors' counsel argued that even assuming that all of these individuals voted to accept the plan, the elimination of 561 accepting votes still results in the Third Amended Plan having been approved by approximately 95% of the Class 5 Claimants. (Nov.

36

13, 2008 Tr. at pp. 75-76).

All exhibits marked for identification were moved into evidence.

The Debtors and FFIC elected to submit proposed findings of fact and conclusions of law, and the Court scheduled deadlines for submissions and responses.

Proposed Findings of Fact

On December 3, 2008, the Debtors submitted their Proposed Findings of Fact and Conclusions of Law and a Proposed Confirmation Order (the "Debtors' Proposed Findings of Fact and Conclusions of Law"). On December 17, 2008, FFIC filed the proposed Findings of Fact and Conclusions of Law Submitted by Fireman's Fund Insurance Company in Support of Objections to Confirmation of the Fourth Amended Plan of Reorganization of Burns and Roe Enterprises, Inc. and Burns and Roe Construction Group, Inc. (the "FFIC Proposed Findings of Fact and Conclusions of Law").

The Debtors' Reply to Proposed Findings of Fact and Conclusions of Law Submitted by Fireman's Fund Insurance Company and the American Insurance Company (the "Debtors' Reply") was filed on December 24, 2008. The Debtors' Reply contends that "FFIC's proposed conclusions of law are, with one notable exception, a rehash of the arguments contained in Fireman's Fund's Brief in Support of its Objections to Confirmation," and the Debtors direct the Court to the Briefs filed by the Debtors, the Committee, and the Legal Representative in support of Confirmation. *See Debtors' Reply* at 1. The Debtors argue that the Court must reject

37

FFIC's argument that the Debtors have failed to establish that they will be subject to substantial future asbestos demands as in the Debtors' opinion "(i) FFIC lacks standing to raise it, (ii) FFIC is estopped from raising it because of its failure to raise it in previously filed confirmation objections; and (iii) the Debtors did submit sufficient evidence to satisfy the requirement, and (iv) FFIC's argument lacks any support in the controlling statutory and decisional law." *Id.* at 2-3. In response to paragraph 54 of FFIC's Proposed Findings of Fact and Conclusions of Law, which states that "neither NERA[5] nor ARPC[6] testified at the confirmation hearing, and no expert reports were introduced into evidence," the Debtors argue that neither NERA nor ARPC was retained to provide expert testimony. *Id.* at 3. Further, the Debtors contend that "Section 524(g)(2)(B)(ii)(I) does not specify the types of evidence that is required to support a finding that a debtor is likely to be subject to substantial future demands for payment of asbestos claims," and argue that "[b]ased on Mr. Smith's testimony, it is only common sense to conclude that, but for the imposition of the automatic stay imposed by 11 U.S.C. §362(a), the Debtors would have continued to be subject to 'substantial' asbestos personal injury claims after December 4, 2000." *Id.* at 5.

Additionally, the Debtors contend that many of FFIC's proposed findings of fact are not supported by the record. Specifically, in response to FFIC's allegation that insurers would be excluded from the claims resolution process, the Debtors contend that "nothing in the TDPs or the Plan either requires or forecloses FFIC's

---

5 NERA stands for "National Economic Research Associates."
6 ARPC stands for "Analysis Research and Planning Corporation."

participation in the claim resolution process." *Id.* at 6. Similarly, the Debtors posit that "nothing in the Plan, the TDP's or any other Plan Document abrogates any of FFIC's defenses to coverage, including defenses based on an alleged failure to involve FFIC in the claims handling process," and the Debtors note that "Plan Section 11.4 explicitly preserves to FFIC its rights to assert any rights or claims or defenses under, arising from or in connection with the FFIC Policies." *Id.* at 6. Further, in response to FFIC's Proposed Finding of Fact #40,[7] the Debtors assert that Section 6.5 of the TDP provides that "nothing in this TDP, the Plan or the Trust Agreement expands, limits or impairs the obligations under applicable law of a claimant to respond fully to lawful discovery in any underlying civil actions regarding his or her submission of factual information to the PI Trust for the purpose of obtaining compensation for asbestos-related injuries from the PI Trust." *Id.* at 7. Finally, the Debtors reject FFIC's Proposed Finding of Fact #36-38,[8] which state that

---

7 FFIC's Proposed Finding of Fact #40 provides:

> In the event that the Trust would seek to tender any claims for coverage to an insurer, the insurer's contractual and legal rights to discover information and documentation relating to any asbestos-related claims would also be compromised by the TDPs. Under the TDPs, the submissions made by the claimant to the Trust would be treated as confidential. The TDPs provide that the Trust would preserve the confidentiality of such submissions unless ordered to disclose the materials to a third party in response to a subpoena, or the Trust, with the consent of the TAC and the Legal Representative, elects to disclose such materials. TDP § 6.5.

8 FFIC's Proposed Finding of Fact #36 provides:

> Under the TDPs, claimants would be relieved of the obligation to establish their respective claim in the tort system. Thus, instead of proving the traditional elements of such claim required in the tort system (i.e., duty, breach, cause, harm), claimants seeking compensation from the Trust would only be required to submit a proof of claim form. TDP § 5.3.

FFIC's Proposed Finding of Fact #37 provides:

> The burden of establishing that BREI was the legal and proximate cause of any asbestos-related injuries is likely eliminated. Rather, to establish that the claimant was exposed to an asbestos-containing product with respect to which BREI has legal liability, the claimant may simply submit a sworn statement, invoices or employment records indicating that the claimant worked at a project site where BREI was involved (without any further direct correlation to BREI). TDP § 5.7(b)(3).

39

the criteria for payment of claims under the TDP will allow for the payment of claims that would not be compensated in the tort system. *Id.* at 7. Debtors contend that "FFIC has not produced any evidence demonstrating the criteria used by the Debtors and their insurance carriers in settling claims in the tort system prior to the filing of the Chapter 11 case, the criteria used by other asbestos defendants and insurance carriers in settling claims in the tort system or the evidentiary standards required to obtain a personal injury judgment in any of the jurisdiction in which the Debtors were sued." *Id.*

Also on December 24, 2008, the Debtors submitted revised proposed Findings of Fact and Conclusions of Law (the "Debtors' First Revised Finding of Fact") and a revised Confirmation Order (the "Debtors' First Revised Confirmation Order"). According to the Debtors, the Debtors' First Revised Findings of Fact and Conclusions of Law provide that the Debtor is no longer seeking a determination that a transfer of the Debtors' Insurance Rights in the FFIC Policies is valid and enforceable, and instead provides that "if claims are asserted against the FFIC Policies following Confirmation, the validity of the transfer of the Insurance Rights will be decided in the context of that litigation, with the rights of all parties reserved." *Debtors' Letter Brief dated December 24, 2008* at 2. The Debtors argue

---

FFIC's Propose Finding of Fact #38 provides:

> Moreover, the burden on holders of asbestos-related claims of establishing damages would likewise be alleviated. Under the TDPs, if a claimant is able to supply information necessary to meet the presumptive Medical/Exposure criteria for a given Disease Level, the claimant will be paid the Scheduled Value for such Disease Level. TDPs § 5.(a)(1). Thus, the determination whether a claim is compensable, and the amount of the award, would entail a comparison of the information supplied by the claimant with the Medical/Exposure criteria for the respective Disease Level.

that such a scenario strips FFIC of any possible standing to object to Confirmation, and moots FFIC's objections to Confirmation based on the transfer of the insurance rights being improper, and moots paragraphs 86-108 of FFIC's proposed Findings of Fact and Conclusions of Law, which concern the validity of the transfer of Insurance Rights in the FFIC Policies. *Id.*

Specifically, the Debtors contend that Debtors' First Revised Findings of Fact and Conclusions of Law modifies paragraph 13 of the Debtors' Proposed Findings of Fact and Conclusions of Law by now providing that the "Court's determination that the transfer of the Debtor's Insurance Rights is valid and enforceable shall not apply to the transfer of the Debtors' Insurance rights in the FFIC Policies, with respect to which, the rights of all parties to argue for or against the validity of the transfer in subsequent coverage litigation in a non-bankruptcy court, on any and all grounds, are expressly reserved and preserved." *Id.* at 2.

The Debtors contend that Debtors' First Revised Findings and Conclusions of Law and First Revised Confirmation Order are consistent with the Plan because a conclusion that the transfer of the Policy Rights is valid and enforceable is not a condition to Confirmation. *Id.* The Debtors assert that there is no longer any provision of the Plan, the 'Plan Documents,' Debtors' Proposed Findings of Fact and Conclusions of Law or Debtors' Proposed Confirmation Order that affects FFIC's rights in any manner, and argue that FFIC no longer has standing as the "validity of

the transfer of the Debtors' Insurance Rights in the FFIC Policies was the sole issue on which FFIC had standing to object to Confirmation." *Id.* at 2.

By letter dated December 29, 2008, Fireman's Fund requested the opportunity to submit a brief reply to the revised Findings of Fact and Conclusions of Law. On December 30, 2008, this Court entered an Order allowing FFIC to submit its reply within seven days of the date of the filing of this order. On January 6, 2009, FFIC submitted a Letter in reply to the Debtors' First Revised Findings of Fact and Conclusions of Law ("FFIC's Reply"). FFIC's reply argues that "confirmation of the Fourth Amended Plan still provides for assignment of the FFIC Policies to the Trust, and would purportedly obligate FFIC to render performance to the Trust, while simultaneously discharging Reorganized Debtors from all their reciprocal contractual obligations to FFIC under the FFIC Policies." *FFIC's Reply* at 2. FFIC continues to argue that such an assignment, even without a judicial decree as to its validity, would impair FFIC's contractual rights under the FFIC Policies, and as such, affords FFIC standing. *Id.* According to FFIC, the fact that the Insurance Rights under the FFIC Policies still are contemplated to be transferred to the Trust pursuant to the Plan, combined with any impairment of FFIC's contractual rights directly resulting from confirmation of the Plan affords FFIC continued standing to object to the assignment of the FFIC Policies. *Id.* at 6. In support of their position, FFIC cites *Combustion Eng'g*, 391 F.3d at 217; *Marin Motor Oil,* 689 F.2d at 451; *Baron & Budd, P.C.* v. *Unsecured Asbestos Claimants Comm.*, 321 B.R.147, 158-159 (D.N.J. 2005).

On February 4, 2009, the Debtors submitted new Revised Findings of Fact and Conclusions of Law ("Debtors' Second Revised Findings of Fact and Conclusions of Law") and a Revised Confirmation Order ("Debtors' Second Revised Confirmation Order") pursuant to which the Insurance Rights under the FFIC Policies are not being assigned to the Trust, but rather, will vest in the Reorganized Debtors following the Plan's 'Effective Date.' *Debtors' Letter Brief dated February 4, 2009* at 2. The Debtors contend that such a scenario leaves "FFIC in the exact position it was in prior to the commencement of the Debtors' Chapter 11 cases," and with the concurrence of the Committee and the Legal Representative, was done "to remove any argument as to FFIC's standing to object to Confirmation." *Id.* Further, to accomplish such changes, paragraphs I.B.5 and I.B.6. of Debtors' Second Revised Confirmation Order exclude all insurance policies issued by FFIC and American Insurance Co. from the Plan's definition of "Subject Insurance Policies" contained in Plan Section 1.1(62) and removes the FFIC policies from the list of Subject Insurance Policies attached to the Plan as Exhibit "F". The Debtors, with the consent of the Committee and the Legal Representative, have also modified Section III.A of the Asbestos Insurance Rights Transfer Agreement, attached to the Plan as Exhibit "B", to make clear that the interests of the Debtors in the FFIC Policies are not being transferred to the Trust. Additionally, the Debtors contend that modifications to Conclusion of Law Number 3, "make clear that the Debtors' Insurance Rights under the FFIC Policies will vest in the Reorganized Debtors following the Effective Date and that any

43

claims that may be asserted for which the FFIC Policies provide coverage will be subject to the same contractual rights and obligations as existed prior to the commencement of the Debtors' Chapter 11 cases." *Id.* at 2. The Debtors argue that the Plan, as now modified, renders moot FFIC's objections to confirmation and requires a determination that FFIC lacks standing to object to Confirmation of the Plan, as the Plan "no longer provides for the assignment of the Debtor's Insurance Rights in the FFIC Policies to the Trust, does not diminish FFIC's property, increase its burdens or impair its rights in any manner." *Id.* at 3.

On February 6, 2009, FFIC filed a letter in reply to the Debtors' February 4, 2009 submission, in which FFIC argues that the recent modifications in the Debtors' revised Confirmation Order and Findings of Fact "do not address all of FFIC's objections to the Fourth Amended Plan and do not eliminate FFIC's standing to object to confirmation." *FFIC's Letter Brief* dated February 6, 2009 at 2. FFIC also requested to have until February 20, 2009, to consider these modifications and to submit a written response to the issues raised in Mr. Zackin's letter. *Id.*

On February 9, 2009, the Debtors filed a letter in response to FFIC's letter dated February 6, 2009. In their submission, the Debtors contend that "[e]very alleged adverse consequence that FFIC has argued will result from Confirmation of the Plan has been eliminated as a result of the February 4, 2009 Modifications." Further, the Debtors contend that their proposed Conclusion of Law Number 3

makes explicit that all of FFIC's rights under its policies will be unaffected by Confirmation of the Plan.

The Debtors also oppose FFIC's request for a two-week period to respond to the February 4, 2009 modifications, as the Debtors and the Plan Proponents took this step in order to avoid any further delay in the Debtors' emergence from Chapter 11, after concluding that a settlement with FFIC would not be possible.

On February 11, 2009, FFIC filed a response to the Debtors' February 9, 2009 submission. FFIC disputes the Debtors' contentions that the modifications eliminate all of FFIC's objections to the Plan. Specifically, FFIC contends that "under the latest modified version in the Fourth Amended Plan, Debtors purport to retain the right to assert claims under the FFIC Policies." Further, FFIC contends that the modifications do not provide adequate assurances "that Debtors will remain obligated to perform their reciprocal contractual obligations under the FFIC Policies," and fails to "alleviate the possibility that FFIC will be compelled to provide coverage under the FFIC Policies, even if Debtors are relieved of their corresponding contractual obligations through the discharge and injunction provisions in the Fourth Amended Plan." Further, FFIC argues that "under the discharge and injunction provisions of the Fourth Amended Plan, FFIC would face a significant risk that FFIC's contractual rights, as well as Debtor's corresponding contractual obligations, would be discharged if the Fourth Amended Plan is confirmed." Additionally, FFIC contends that the Debtors have failed to evidence that they will be subject to future asbestos liabilities. FFIC

45

disputes the Debtors' contention that it seeks to delay confirmation, arguing that "FFIC's sole objective is to preserve all of its contractual rights and Debtors' reciprocal obligations under the FFIC Policies."

### Discussion

As a threshold matter, the Court must determine whether FFIC has standing to object to confirmation. "The question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." Id. The United States Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992), summarized the requirements of standing as follows:

> First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized...and (b) "actual or imminent, not 'conjectural or 'hypothetical'"...Second, there must be a casual connection between the injury and the conduct complained of-the injury has to be "fairly...trace[able] to the challenged action of the defendant, and not...th[e] result [of] independent action of some third party not before the court."...Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Further, the "injury in fact test" requires that "the party seeking review be himself among the injured." *Id.* at 561.

Section 1109(b) of the Bankruptcy Code provides: "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders'

46

committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."

Although "[t]he Code does not include a definition of a party in interest; it is clear, however that the term 'party in interest' is not limited by the small list of examples in § 1109(b)." *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985)(citing 5 *Collier on Bankruptcy* ¶ 11109.2, at 1109-22 (L. King 15th ed .1984). "Consequently, courts must determine on a case by case basis whether the prospective party in interest has a sufficient stake in the proceedings so as to require representation." *Id.*, *citing In re Penn-Dixie Indus., Inc.*, 9 B.R. 941, 943 n.7 (Bankr. S.D.N.Y. 1981)).

In evaluating FFIC's standing, the Court will consider the validity of the modifications to the Plan. The Court notes that Section 12.4 of the Plan provides that "[p]rior to the entry of the Confirmation Order, the Debtors reserve the right, upon the written consent of the Committee and the Legal Representative, and in accordance with the Bankruptcy Code, to amend or modify this Plan."

Section 1127(a) of the Bankruptcy Code provides: "The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of section 1122 and 1123 of this title. After the proponent of a plan files a modification with the court, the plan as modified becomes the plan."

Section 1127(c) of the Bankruptcy Code provides:

47

"The proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified."

Section 1127(d) of the Bankruptcy Code provides:

"Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection."

Rule 3019 of the Federal Rules of Bankruptcy Procedure provides:

"In a chapter 9 or chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan."

If the amendments are material and adversely affect the way creditors are treated, 11 U.S.C. § 1127 requires a new disclosure statement and balloting of the amended plan. *In re New Power Co.*, 438 F.3d 1113 (11th Cir. 2006). Whether an amendment is material is a mixed question of law and fact. *Id.* at 1117. In the instant case, the Court concludes that the modifications do not adversely affect

48

creditors, and the Court will consider the Plan as modified without the need for further balloting.

As a result of the Debtors' modifications to the Plan, the Debtors' interests in the FFIC Policies are not being transferred to the Trust. Rather, on the Effective Date, the Debtors' rights in the FFIC Policies will vest in the Reorganized Debtors pursuant to Section 10.1 of the Plan and 11 U.S.C. §§ 1123(a)(5)(A) and 1141(b). As a result, the Debtors' coverage under the FFIC Policies will remain in place, unaffected by the Plan. Any claims that are asserted for which the FFIC Policies provide coverage will be subject to the same contractual rights and obligations as existed prior to the commencement of the Debtors' Chapter 11 cases. FFIC will not be prejudiced by confirmation since it will be placed back into the identical position existing prior to the commencement of the Debtors' Chapter 11 cases. While FFIC has argued that " these most recent modifications do not alleviate the possibility that FFIC will be compelled to provide coverage under the FFIC Policies, even if Debtors are relieved of their corresponding contractual obligations through the discharge and injunction provisions in the Fourth Amended Plan, from which FFIC is not adequately excluded," FFIC retains the right to argue that the Debtors breached the terms of the FFIC Policies. *See In re Mid-Valley, Inc.*, et al., 305 B.R. 425, 431 (Bankr. W.D. Pa. 2004).

Having concluded that FFIC lacks standing to object to confirmation of the Plan, the Court will now analyze whether the requirements for confirmation found in Section 1129 are met.

49

Section 1129(a)(1) provides:

(a) The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this title.

The Court will now determine whether the Plan complies with other applicable provisions of § 1129(a)(1) of the Bankruptcy Code, including § 1122 and 1123 of the Bankruptcy Code. Section 1122 of the Bankruptcy Code, which governs the classification of claims or interests, requires:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

Section 1122's requirement that all claims which are together be substantially similar "insures that large claims of differing legal natures do not dictate other claims within a class." *In re Resorts Intern., Inc.*, 145 B.R. 412, 447 (Bankr. D.N.J. 1990) (citations omitted). In the instant case, Article IV of the Debtors' Plan designates seven classes of Claims and Equity Interests as follows:

Class 1A- Allowed Tax Claims

Class 2- Allowed Secured Claims

Class 3- Allowed General Unsecured Claims Except Asbestos Personal Injury Claims

Class 4- Litigation Claims

Class 5- Asbestos Personal Injury Claims and Indirect Asbestos Personal Injury
Claims

Class 6- Workers Compensation Claims

Class 7- Allowed Equity Interests

Section 5.1 of the Plan provides that Class 2- Allowed Secured Claims;
Class 3- Allowed General Unsecured Claims Except Asbestos Personal Injury
Claims; Class 4- Litigation Claims; Class 6- Workers Compensation Claims;
Class 7- Allowed Equity Interests; are unimpaired under the Plan and, therefore,
are deemed to have accepted the Plan:

The Court concludes that under this plan the claims of each class are
substantially similar to meet the requirements of § 1122(a). The Court notes that
no objections have been filed alleging otherwise. Further, "[i]t is also clear that
even though some class members may have stronger claims, or stronger defenses
than others, they may be classified together so long as their claims are
substantially similar and their treatment is approximately equal." *Resorts*, 145
B.R. at 448.

Section 1123(a) of the Bankruptcy Code, which governs the contents of a plan
provides that:

  (a) Notwithstanding any otherwise applicable nonbankruptcy law, a
plan shall--
    (1) designate, subject to section 1122 of this title, classes of
  claims, other than claims of a kind specified in section 507(a)(2),
  507(a)(3), or 507(a)(8) of this title, and classes of interests;
    (2) specify any class of claims or interests that is not
  impaired under the plan;

51

(3) specify the treatment of any class of claims or interests that is impaired under the plan;

(4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

(5) provide adequate means for the plan's implementation, such as--

(A) retention by the debtor of all or any part of the property of the estate;

(B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;

(C) merger or consolidation of the debtor with one or more persons;

(D) sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;

(E) satisfaction or modification of any lien;

(F) cancellation or modification of any indenture or similar instrument;

(G) curing or waiving of any default;

(H) extension of a maturity date or a change in an interest rate or other term of outstanding securities;

(I) amendment of the debtor's charter; or

(J) issuance of securities of the debtor, or of any entity referred to in subparagraph (B) or (C) of this paragraph, for cash, for property, for existing securities, or in exchange for claims or interests, or for any other appropriate purpose;

(6) provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation referred to in paragraph (5)(B) or (5)(C) of this subsection, of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends;

(7) contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer,

director, or trustee under the plan and any successor to such officer, director, or trustee; and

(8) in a case in which the debtor is an individual, provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan.

(b) Subject to subsection (a) of this section, a plan may--

(1) impair or leave unimpaired any class of claims, secured or unsecured, or of interests;

(2) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section;

(3) provide for--

(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

(B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest;

(4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;

(5) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; and

(6) include any other appropriate provision not inconsistent with the applicable provisions of this title.

(c) In a case concerning an individual, a plan proposed by an entity other than the debtor may not provide for the use, sale, or lease of property exempted under section 522 of this title, unless the debtor consents to such use, sale, or lease.

(d) Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

Concerning § 1123(a)(4), Article IV of the Plan provides that the

53

treatment of each Claim or Equity Interest within a Class is to be the same as the treatment of each other Claim or Equity Interest in such Class unless the holder of a Claim or Equity Interest has agreed to or subsequently agrees to less favorable treatment on account of its Claim or Equity Interest.

Concerning § 1123(a)(5), the Plan, including Article VII of the Plan, provides adequate means for its implementation. Specifically, Article VII creates the Trust that will assume all liability and responsibility to satisfy all Trust Claims. From and after the Effective Date, all Trust Claims will be subject to the Permanent Channeling Injunction pursuant to Section 524(g) of the Bankruptcy Code. The Protected Parties and the Settling Insurance Entities shall have no obligation to pay any liability of any nature or description arising out of Trust Claims.

Concerning § 1123(a)(6), § 10.2 of the Plan provides that the Reorganized Debtors' certificates of incorporation shall be deemed to contain provisions prohibiting the issuance of nonvoting equity securities.

Concerning, § 1123(a)(7), the provisions of the Plan and the Reorganized Debtors' charters, bylaws and similar constituent documents regarding the manner of selection of officers and directors of the Reorganized Debtors are consistent with the interests of creditors and equity security holders and with public policy.

Concerning § 1123(b)(1), Article V of the Plan provides for the impairment of only Class 5 Asbestos Personal Injury Claims and Indirect

54

Asbestos Personal Injury Claims, with all other classes remaining unimpaired.

Concerning § 1123(b)(2), Article IX of the Plan provides that all executory contracts and unexpired leases of the Debtors that have not already been assumed or rejected shall be deemed assumed as of their Effective Date, unless there is then pending before the Bankruptcy Court a motion for the rejection of such executor contract and/or unexpired lease.

Concerning § 1123(b)(5), Article VI of the Plan modifies or leaves unaffected, as the case may be, the rights of holders of each class of Claims and Equity Interests.

Concerning § 1123(b)(6), the Plan includes additional appropriate provisions that are not inconsistent with the applicable provisions of the Bankruptcy Code, including, without limitation, Section 7.3, which provides that, in consideration for the agreement of BRSC to transfer certain of its Insurance Rights to the Trust and to be a joint obligor on the Promissory Note, the Trust will assume all liability and responsibility to satisfy all Asbestos Personal Injury Claims, Indirect Asbestos Personal Injury Claims and Demands asserted against BRSC if BRSC (i) files a petition under Chapter 11 of the Bankruptcy Code and (ii) obtains confirmation of a Chapter 11 plan providing for the assumption by the Trust of liability and responsibility to satisfy all Asbestos Personal Injury Claims, Indirect Personal Injury Claims or Demands against BRSC. Accordingly, the requirements of § 1129 (a)(1) have been satisfied.

Section 1129(a)(2) requires that "the proponent of the plan complies

with the applicable provisions of this title." In conducting this inquiry, the Court will give consideration to whether the Plan complies with Section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.

In the instant case, the Bankruptcy Court on January 19, 2006, entered an order approving the adequacy of the Disclosure Statement relating to the Plan. As evidenced by the Affidavit of Service and Affidavit of Publication, the Disclosure Statement and the procedures by which the Ballots for acceptance or rejection of the Plan were solicited and tabulated were fair, properly conducted and in accordance with Sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, the Voting Procedures Order and the Disclosure Statement Order. Votes with respect the Plan were solicited in good faith in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, the Voting Procedures Order and the Disclosure Statement, as evidenced by the Affidavit of Kenneth Altman.

In light of the foregoing, the Debtors' solicitation and notice with respect to acceptances or rejections of the Plan were adequate and sufficient under the circumstances. Without limiting the foregoing, the Court hereby determines that no further solicitation or notice is required in connection with the Plan. The Court concludes that the Debtors, together with (where applicable) their respective directors, officers, employees, agents and professionals, acting in such capacity, have acted in "good faith," within the meaning of Section 1125(e) of the Bankruptcy Code. Accordingly, the requirements of § 1129(a)(2) have been

satisfied.

Section 1129(a)(3) requires that "The plan has been proposed in good faith and not by any means forbidden by law." The Third Circuit has stated that "[f]or purposes of determining good faith under section 1123(a)(3)....the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000)(citations omitted). Based on the evidence presented at the Confirmation Hearing and from the terms of the Plan itself, the Court finds and concludes that the Plan has been proposed with the legitimate purpose of reorganizing the affairs of each of the Debtors and maximizing the returns available to creditors and holders of Equity Interests. Consistent with the objectives and purposes of the Bankruptcy Code, the Plan is designed to allow each of the Debtors to reorganize by resolving certain pending disputes and proceedings and providing the Reorganized Debtors with a capital structure that will allow them to satisfy their obligations with sufficient liquidity and capital resources and to fund necessary capital expenditure and otherwise conduct their businesses. In particular, and without limitation, the Plan achieves a global resolution of Trust Claims through the assumption of such Claims by the Trust, subject to the terms of the Plan. The Court hereby concludes that that the Debtors proposed the Plan in good faith and not by any means forbidden by law. Accordingly, the requirements of § 1129(a)(3) have been satisfied.

57

Section 1129(a)(4) requires that "Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." Concerning § 1129(a)(4), Mr. Smith testified that no payment for services or costs and expenses or professionals in or in connection with the Reorganization Cases, or in connection with the Plan and incidental to the Reorganization Cases, has been or will be made by the Debtors, other than payments that have been authorized by order of the Bankruptcy Court. Additionally, Section 12.1(b) of the Plan provides that the Bankruptcy Court shall retain jurisdiction after the Effective Date to hear and determine all applications for allowance of compensation to professionals or reimbursement of expenses under Sections 330, 331, or 503(b) of the Bankruptcy Code. Accordingly, the requirements of § 1129(a)(4) have been satisfied.

Section 1129(a)(5)(A) requires that:
> (i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and
> (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and
> (B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

Section 101(30)(B) of the Bankruptcy Code defines "insider" in the

case of a debtor that is corporation to include a "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor.

Concerning § 1129(a)(5), the Debtors have disclosed the identity and affiliations of each individual proposed to serve, after confirmation of the Plan, as a director and/or officer of the Debtors and the appointment to or continuation in such office by such individual is consistent with the interests of creditors and equity security holders and with public policy. The Debtors have also disclosed the identity of each insider that will be employed or retained by the Reorganized Debtors and the nature of the compensation to such insider. Accordingly, the requirements of § 1129(a)(5) have been satisfied.

Section 1129(a)(6) requires that "Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." In the instant case, § 1129(a)(6) is satisfied as the Debtors are government contractors and therefore subject to the Federal Acquisition Regulations ("FAR") which govern contracts with federal agencies and establish allowable costs and overhead rates that can be charged. Further, nothing in the Plan modifies or purports to modify the rates allowable by FAR. Accordingly, the requirements of § 1129(a)(6) have been satisfied.

Section 1129(a)(7) requires that "With respect to each impaired class of claims or interests--

59

(A) each holder of a claim or interest of such class—
(i) has accepted the plan; or
(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or
(B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims."

In the instant case, under the Plan, each holder of an impaired Class 5

Claim that has not accepted the Plan will, on the account of such claim, receive or

retain property under the Plan having a value, as of the Effective Date, that is not

less than the amount that such holder would receive or retain if the Debtors were

liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

Accordingly, the requirements of § 1129(a)(7) have been satisfied.

Section 1129(a)(8) requires that "With respect to each class of claims or interests-
    (A)   such class has accepted the plan; or
    (B)   such class is not impaired under the plan."

As stated in the Balloting Affidavit, all Classes of Claims and Equity

Interests under the Plan have either accepted the Plan or are unimpaired.

Specifically, the holders of Class 5 Claims, the only Class impaired by the Plan,

voted to accept the Plan by at least two-thirds in amount and more than one half in

number of Claims in accordance with Section 1126(c) of the Bankruptcy Code.

Accordingly, the requirements of Section 1129(a)(8) have been satisfied.

Section 1129(a)(9) requires that:
    Except to the extent that the holder of a particular claim has
    agreed to a different treatment of such claim, the plan provides
    that—

(A) with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B) with respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each holder of a claim of such class will receive—

(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and (C) with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

Concerning § 1129(a)(9), Section 6.1 of the Plan provides that "each holder of a Class 1 Allowed Administrative Claim against the Debtors shall receive cash equal to the Allowed Amount of its Administrative Claim on or as soon as practicable after the Effective Date, except to the extent that any holder agrees to different treatment, subject to reasonable approval of the ACC and the FCR.  In addition, Section 6.2 of the Plan provides "that a holder of an Allowed Tax Claim shall receive, at the Debtors' option, (subject to the prior reasonable approval of the Committee and the Legal Representative), either (a) the full amount of its Allowed Tax Claim, without interest, on the Effective Date; (b) deferred Cash payments over a period not exceeding six years after the date of assessment of such Claim, of a value as of the Effective Date, equal to the Allowed Amount of such Claim; or (c) such other treatment that may be agreed to by the Debtors and the holder of an Allowed Tax Claim (subject to the reasonable

approval of the Committee and the Legal Representative)," in accordance with Section 507(a)(8) of the Bankruptcy Code. The Debtors do not believe that such Tax Claims exist." Accordingly, the requirements of § 1129(a)(9) have been satisfied.

Section 1129(a)(10) requires that: "If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."

As indicated in the Balloting Affidavit, the only impaired Class of Claims-Class 5- has voted to accept the Plan, determined without including the acceptance by any insider of the Debtors. Accordingly, the requirements of § 1129(a)(10) have been satisfied.

Section 1129(a)(11) requires that "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

Based on the testimony of Mr. Smith and Mr. Calascibetta, the Court is satisfied that Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or the Reorganized Debtors. Accordingly, the requirements of § 1129(a)(11) have been satisfied.

Section 1129(a)(12) requires that "All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been

paid or the plan provides for the payment of all such fees on the effective date of the plan."

Concerning § 1129(a)(12), Section 12.6 of the Plan provides that all fees payable pursuant to Section 1930 of title 28 of the United States Code shall be paid by the Debtors and the Reorganized Debtors as and when due.   Accordingly, the requirements of § 1129(a)(12) have been satisfied.

Section 1129(a)(13) requires that: The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

The Plan complies with Section 1129(a)(13) as Section 12.12 of the Plan provides that "[p]ursuant to Section 1129(a)(13) of the Bankruptcy Code, after the Effective Date, the Reorganized Debtors shall continue to pay all 'retiree benefits' as defined in Section 11.4 of the Bankruptcy Code, at the level established prior to confirmation of the Plan, for the duration of the period the Debtors obligated itself to provide such benefits, if any."   Accordingly, the requirements of § 1129(a)(13) have been satisfied.

The Court concludes that the Plan complies in all respects with the applicable requirements of § 1129 of the Bankruptcy Code.

<u>Asbestos Personal Injury Trust</u>

The Plan calls for the creation and establishment of an Asbestos Personal Injury Trust, on the Effective Date, pursuant to the Asbestos Personal Injury

Documents. *Plan,* § 7.1. On the 'Effective Date,' the Trust will assume all liability and responsibility to satisfy all Trust Claims against the Protected Parties. *Plan,* § 7.2. Additionally, the Trust will assume all liability and responsibility to satisfy all Asbestos Personal Injury Claims, Indirect Asbestos Personal Injury Claims or Demands asserted against BRSC if (i) BRSC files a petition under Chapter 11 of the Bankruptcy Code and (ii) obtains confirmation of a Chapter 11 plan providing for the assumption by the Asbestos Personal Injury Trust of liability and responsibility to satisfy Asbestos Personal Injury Claims or Demands asserted against BRSC. *Plan,* § 7.3.

Additionally, from and after the Effective Date, all Trust Claims will be subject to a Permanent Channeling Injunction pursuant to Section 524(g) of the Bankruptcy Code and the provisions of this Plan and the Confirmation Order, and those entities defined as 'Protected Parties' and any 'Settling Insurance Entities' shall have no obligation to pay any liability of any nature or description arising out of Trust Claims, provided, however, that nothing in the Plan shall preclude any action by the Asbestos Personal Injury Trust to enforce the Terms of the Plan or a Subject Insurance Settlement Agreement entered into by a Settling Insurance Entity. *Plan,* § 7.4.

The Trust is to be funded, in part, by the Settlement Amount of $9.5 million pursuant to the Plan and the Settlement and Pledge Agreement (Plan Exhibit "E"). Of this total, $9.25 million is payable over time pursuant to a security issued by the Debtors in the form of a Promissory Note made by the Debtors, BRG, BRSC and

Winona Hudson Corporation ("WH"), the owner of one hundred percent (100%) of the shares of BRG, all of whom are joint and several obligors. (Plan Exhibit "D"). In addition, the Debtors are assigning the Insurance Rights to the Trust pursuant to the Plan and the Asbestos Insurance Rights Transfer Agreement. (Plan Exhibit "B".) Pursuant to settlements approved by the Bankruptcy Court, Settling Insurance Entities have paid or are required to pay more than \$162 million to or for the benefit of the Trust.

Pursuant to the Settlement and Pledge Agreement, the Promissory Note is secured by the Pledge to the Trust of fifty-one percent of the voting shares of BRG, the Debtors' parent company (the "Pledged Shares"). The Trust shall be entitled to foreclose on the Pledged Shares upon the occurrence of an event of default under the terms of the Promissory Note and the Settlement and Pledge Agreement and the expiration of the grace periods provided therein. Accordingly, the Trust is entitled to own, if specified contingencies occur, a majority of the voting shares of the parent corporation of each of the Debtors as provided in clause (bb) of Section 524(g)(2)(B)(i)(III) of the Bankruptcy Code, and the requirements of that Section are therefore satisfied.

Pursuant to the Asbestos Personal Injury Trust Agreement, the Trust is to use its assets and the income therefrom to pay the expenses of the Trust and Trust Claims.

The terms of the Permanent Channeling Injunction, including its provisions barring actions against the Protected Parties and the Settling Insurance Entities

65

pursuant to Section 524(g)(4)(A) of the Bankruptcy Code are set out in the Plan and the Disclosure Statement.

As set forth in Section 6.6 of the Plan, in the Asbestos Personal Injury Trust Agreement (Plan Exhibit "C") and in the Trust Distribution Procedures (Plan Exhibit "H"), all Trust Claims shall be determined and paid pursuant to the terms of the Plan, the Asbestos Personal Injury Trust Agreement, the Trust Distribution Procedures and the CNA Addendum. The Asbestos Personal Injury Trust Agreement and the Trust Distribution Procedures provide that the Trust will be administered by the Trustee (subject to the provisions of the Asbestos Personal Injury Trust Agreement), and shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Trust Claims, or other comparable mechanisms, that provide reasonable assurance that the Trust will value, and will be in a financial position to pay present Asbestos Personal Injury Claims and Demands that involve similar claims in substantially the same manner.

Section 1.1(56) of the Plan (as modified by the Confirmation Order) and Section 7.4 of the Plan contemplate that, in addition to protecting the Debtors and the Reorganized Debtors, the Permanent Channeling Injunction will be extended to protect certain non-debtor Entities, pursuant to Section 524(g)(4)(A)(ii) of the Bankruptcy Code, to the extent that any such Entity is alleged to be directly or indirectly liable for the conduct of, Claims against or Demands on the Debtors, if such alleged liability of such Entity arises by one or more of the following:

66

a.      such Entity's ownership of a financial interest in the Debtors or the Reorganized Debtors, a past or present affiliate of the Debtors, or a predecessor in interest of the Debtors;

b.      such Entity's involvement in the management of the Debtors or the Reorganized Debtors or a predecessor in interest of the Debtors, or services as an officer, director or employee of the Debtors or a related party, as defined in 11 U.S.C. §524(g)(4)(A)(iii);

c.      such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the Debtors or the Reorganized Debtors or a related party, as defined in 11 U.S.C. §524(g)(4)(A)(iii), including, but not limited to:

   (x)      involvement in providing financing (debt or equity), or advice to an Entity involved in such transaction, including, without limitation, CIT Group/Business Credit, Inc., with respect to its post-petition financing/agreements with the Debtors; or

   (y)      acquiring or selling a financial interest in an Entity as part of such transaction.

Sections 1.1(61) and 7.4 of the Plan provide that Settling Insurance Entities will be protected by the Permanent Channeling Injunction. The Settling Insurance Entities either have made or will make substantial contributions to the Trust in the form of payments to the Trust under the terms of the settlement agreements into with the Debtors.

The Third Circuit has explained that "Section 524(g) provides a special

form of supplemental injunctive relief for an insolvent debtor facing the unique

problems and complexities associated with asbestos liability." *In re Combustion*

*Eng'g*, 391 F.3d 190, 234 (3d. Cir. 2004).  Section 524(g)(2)(B)(i)& (ii) requires

that--

    (i) the injunction is to be implemented in connection with a
trust that, pursuant to the plan of reorganization--
    (I) is to assume the liabilities of a debtor which at the
time of entry of the order for relief has been named as a
defendant in personal injury, wrongful death, or property-damage
actions seeking recovery for damages allegedly caused by the
presence of, or exposure to, asbestos or asbestos-containing
products;
    (II) is to be funded in whole or in part by the securities
of 1 or more debtors involved in such plan and by the obligation
of such debtor or debtors to make future payments, including
dividends;
    (III) is to own, or by the exercise of rights granted under
such plan would be entitled to own if specified contingencies
occur, a majority of the voting shares of--
      (aa) each such debtor;
      (bb) the parent corporation of each such debtor; or
      (cc) a subsidiary of each such debtor that is also a
debtor; and

    (IV) is to use its assets or income to pay claims and
demands; and

    (ii) subject to subsection (h), the court determines that--
    (I) the debtor is likely to be subject to substantial future
demands for payment arising out of the same or similar conduct
or events that gave rise to the claims that are addressed by the
injunction;
    (II) the actual amounts, numbers, and timing of such future
demands cannot be determined;
    (III) pursuit of such demands outside the procedures
prescribed by such plan is likely to threaten the plan's purpose
to deal equitably with claims and future demands;
    (IV) as part of the process of seeking confirmation of such

68

plan--
    (aa) the terms of the injunction proposed to be issued under paragraph (1)(A), including any provisions barring actions against third parties pursuant to paragraph (4)(A), are set out in such plan and in any disclosure statement supporting the plan; and
    (bb) a separate class or classes of the claimants whose claims are to be addressed by a trust described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan; and

    (V) subject to subsection (h), pursuant to court orders or otherwise, the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

Based on the substantial number of asbestos personal injury claims that had been asserted against the Debtors prior to the Petition Date and the substantial number of such claims that remained unresolved on the Petition Date, the Court finds that the Debtors would likely be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the asbestos personal injury claims that were pending against the Debtors on the Petition Date.

In light of (i) the long latency period of asbestos- related diseases, (ii) the inherent uncertainties regarding asbestos-related claims and demands, and (iii) the substantial number and amounts of asbestos-related personal injury and wrongful death claims asserted against the Debtors prior to the Petition Date, the Court finds

69

that the actual number and amounts of future Demands, to which the Debtors would be subject, and the timing of assertion of such Demands, cannot be determined.

The Court concludes that the Demands outside of the procedures prescribed by the Plan would likely threaten the Plan's purpose to deal equitably with Claims and future Demands by resulting in the consumption of the Debtors' assets by those claimants who filed first, potentially leaving nothing for future Demand holders. Given that the Debtors have been subject to substantial past liabilities for Asbestos Personal Injury Claims and because it is impossible to predict with reliability the outcome of future litigation relating to Trust Claims, there is a significant risk that, absent implementation of the procedures described in the Plan to address Trust Claims, the Debtors would be rendered unable to satisfy Demands.

The Court concludes that the Plan comports with the Bankruptcy Code's requirements for the issuance of a channeling injunction to enjoin entities from taking legal action to recover, directly or indirectly, payment in respect to Trust Claims against the Reorganized Debtors or their property. The Court specifically finds that:

    a. The Permanent Channeling Injunction is to be implemented in connection with the Trust.

    b. As of the Petition Date, each of the Debtors had been named as a defendant in personal injury or wrongful death actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.

70

c.   Upon the Effective Date, the Trust will assume the liabilities of the Debtors with respect to Trust Claims.

d.   The Trust will be funded as provided in the Plan.

e.   WH has pledged fifty-one (51%) of the voting shares in BRG to secure the deferred obligations of the Reorganized Debtors as set forth in the Plan.

f.   The Trust shall use its assets or income to pay for its operating expenses and to pay Trust Claims.

g.   The Debtors are likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos Personal Injury Claims and Indirect Asbestos Personal Injury Claims that are addressed by the Permanent Channeling Injunction.

h.   The actual amounts, numbers and timing of future Demands cannot be determined.

i.   Pursuit of such Demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Trust Claims.

j.   The terms of the Permanent Channeling Injunction issued pursuant to Section 524(g)(4)(A) of the Bankruptcy Code are set forth in conspicuous language in the Plan and in the Disclosure Statement.

k. The Plan establishes, in Class 5 thereof, a separate class of Asbestos Personal Injury Claims and Indirect Asbestos Personal Injury Claims to be addressed by the Trust.

l. The holders of Class 5 Claims, voting as a separate class, have voted, by at least 75 percent (75%) of those voting, in favor of the Plan.

m. Pursuant to court orders or otherwise, the Trust shall operate through mechanisms, such as structured, periodic or supplemental payments, *pro rata* distributions, matrices or periodic review of estimates of the numbers and value of Trust Claims or other comparable mechanisms, that provide reasonable assurance that the Trust will value, and be in a financial position to pay, present Asbestos Personal Injury Claims and future Asbestos Personal Injury Claims and Demands that involve similar Claims in substantially the same manner.

n. The FCR was duly appointed pursuant to Section 524(g) of the Bankruptcy Code as part of the proceedings leading to the issuance of the Permanent Channeling Injunction for the purpose of protecting the rights of Entities that hold, or that might subsequently assert Demands, that are bound or will be bound by the Permanent Channeling Injunction.

o. The identification and designation of each Protected Party and Settling Insurance Entity is fair and equitable with respect to Entities that might subsequently assert Demands against any such Protected

Party or Settling Insurance Entity, in light of the benefits provided, or
to be provided, to the Trust, by or on behalf of the Protected Parties
and Settling Insurance Entities.

The Court finds that each of the conditions precedent set forth in Section
8.1(a) through and including Section 8.1(o) of the Plan has been satisfied or duly
waived.

Pursuant to § 1146(a) of the Bankruptcy Code, the Debtors' issuance, transfer,
or exchange of any security or their making or delivery of an instrument of transfer
pursuant to the Plan may not be taxed under any law imposing a stamp tax or similar
tax.

The Court concludes that in light of all of the circumstances and the record in
the Reorganization Cases, the transactions contemplated by or referenced in the Plan
and the Plan Documents and the creation of the Trust are integral to the terms,
conditions and settlements contained in the Plan and are critical to the effectuation of
the purposes of the Plan. All contracts, instruments, releases, agreements and
documents related to, or necessary to implement, effectuate and consummate, the
Plan are valid, proper and reasonable under the circumstances and due and sufficient
notice thereof has been provided in connection with, among other things, approval of
(i) the Disclosure Statement, (ii) entry of the Voting Procedures Order and (iii)
confirmation of the Plan.

The Court concludes that the Debtors, the ACC and the FCR and all other
parties entering into settlement embodied in the Plan, as applicable, participate in

73

good faith in negotiating, at arm's length, the Plan, the Plan Documents, and all other contracts, instruments, releases, agreements and documents related to or necessary to implement, effectuate and consummate the Plan. Each of the Debtors, the ACC, the FCR, and all other parties entering into settlements embodied in the Plan, as applicable, all participated in good faith in each of the actions taken to bring about and in satisfying each of the conditions precedent to confirmation and consummation. In so determining, the Court has examined, among other things, the totality of the circumstances surrounding the filing of the Reorganization Cases, the record of these proceedings and the Plan, the Plan Documents and all related pleadings, exhibits, statements and comments regarding Confirmation of the Plan.

The Court concludes that each of the discharges, injunctions, indemnifications and exculpations provided under the Plan, including those set forth in Plan Sections 7.12, 7.14, 11.1, 11.2 and 11.3 is (1) integral to the terms, conditions and settlements contained in the Plan, (2) appropriate in connection with the reorganization of the Debtors and (3) supported by reasonable consideration. In light of all of the circumstances and the record in the Reorganization Cases, each of the discharges, injunctions, indemnifications and exculpations provided under the Plan is fair and reasonable to all parties in interest. Each of the discharge, injunctive, indemnification and exculpation provisions set forth in the Plan and the Confirmation Order is; (i) within the jurisdiction of the District Court under 28 USC §§ 1334(a), 1334(b) and 1334(d); (ii) an essential means of implementing the Plan pursuant to Section 1123(a)(6) of the Bankruptcy Code; (iii) an integral element of the

74

transactions incorporated into the Plan; (iv) beneficial to, and in the best interests of, the Debtors, their estates and their creditors; (v) critical to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Reorganization Cases with respect to each of the Debtors; and (vi) consistent with section 1005, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

Based on its review of the record in these cases, including the Plan and the Plan Documents and the FRC's testimony at the Confirmation Hearing, the Court concludes that Anthony R. Calascibetta properly discharged his fiduciary duties and responsibilities as the FCR in these cases.

Based upon its review of the entire record of these Cases, including the Plan and the Plan Documents and the CNA Addendum, the Court concludes that the negotiation and implementation of the CNA Addendum was and is an integral part of the Debtors' reorganization efforts and is critical to the success of the Debtors' reorganization.  Accordingly, the CNA Addendum is approved in its entirety.

On consideration of the record in these Cases including the Plan, the Plan Documents and the testimony adduced at the Confirmation Hearing, the Court concludes that the Debtors' transfer of its Insurance Rights pursuant to the Asbestos Insurance Rights Transfer Agreement is critical to the success of the Debtors'

75

reorganization and is authorized by and consistent with the provisions of Sections 1123(a)(5) and 524(g) of the Bankruptcy Code. Accordingly, the validity and enforceability of the transfer of the Insurance Rights is approved notwithstanding anything in any insurance policy issued by any Insurance Entity or any non-bankruptcy law that purports to prohibit or limit such transfer, provided, however, that the validity and enforceability of the transfer of the Insurance Rights with respect to the policies for which Centennial and TIG are responsible are subject to the terms of the Debtors' Stipulations of Settlement with these Insurance Entities, as approved by the Bankruptcy Court.

### Conclusion

The Court will enter an order confirming the Plan.

Dated: February **20**____, 2008

_____
GARRETT E. BROWN, JR., U.S.D.J.